IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES OF AMERICA        §
                                §
v.                              §        C.R. NO. H-03-363
                                §
DANIEL BAYLY,                   §
JAMES BROWN, and                §
ROBERT FURST                    §

<u>ORDER ON MOTIONS TO DISMISS</u>

Pending are Defendants' Motions to Dismiss (Documents Nos. 952 and 964).[1]   After having carefully considered the motions, responses, replies, and the applicable case law, and after having heard counsels' oral arguments on the same, the Court concludes for the reasons that follow that the motions should be denied.

<u>Background</u>

Defendants Brown, Bayly, and Furst (collectively "Defendants") move to dismiss the Third Superseding Indictment from which the honest services theory has been struck.   *See* <u>United States v. Brown</u>, 459 F.3d 509 (5th Cir. 2006).   Defendants challenge the substantive wire fraud charges in Counts Two and Three, and the conspiracy to commit wire fraud charge in Count One, alleging that (1) the Indictment fails to allege facts that Defendants sought to

---

[1] Defendant Robert Furst moved to join these motions, which the Court granted by Order dated September 25, 2007.  Document No. 977.

"obtain" anything from the putative victims; (2) the allegations do not articulate the deprivation of a cognizable property interest on the part of Enron's shareholders; and (3) Enron itself was not a victim of the alleged wire fraud scheme.  Defendants also contend that the conspiracy charge cannot be based on 15 U.S.C. § 78m(b), which criminalizes the falsification of corporate books and records, because § 78m(b) applies only to "issuers" of securities.

## Discussion

"An indictment is sufficient if it contains the elements of the offense charged, informs the defendant of the charges, and enables the defendant to plead acquittal or conviction and avoid future prosecutions for the same offense." United States v. Hatch, 926 F.2d 387, 391-92 (5th Cir. 1991); *see also* United States v. Debrow, 74 S. Ct. 113, 115 (1957) (holding that an indictment must "clearly inform[] the defendants of that with which they [are] accused, so as to enable them to prepare their defense and to plead the judgment in bar of any further prosecutions for the same offense").  "In reviewing a challenge to an indictment alleging that it fails to state an offense, the court is required to take the allegations of the indictment as true and to determine whether an offense has been stated." United States v. Crow, 164 F.3d 229, 234 (5th Cir. 1999); *see also* United States v. Kay, 359 F.3d 738, 742 (5th Cir. 2004).

A.    Substantive Wire Fraud and Conspiracy to Commit Wire Fraud

    1.    "Obtain" Versus "Deprive" in 18 U.S.C. § 1343

Defendants contend that the charges of wire fraud and conspiracy to commit wire fraud must be dismissed because the Indictment fails to allege any facts that Defendants sought to "obtain" for themselves any money or property from the putative victims. *See* Document No. 964 at 7-11; Document No. 952 at 14-15. According to Defendants, "the only schemes 'to defraud' that are actionable under the wire fraud statute are those that are aimed at actual or attempted property *acquisition*." Document No. 964 at 9. On this proposition, the circuits are split. *Compare* Monterey Plaza Hotel Ltd. v. Local 483, 215 F.3d 923, 926-27 (9th Cir. 2000) (requiring that a defendant seek to *obtain* money or property), United States v. Walters, 997 F.2d 1219, 1224-27 (7th Cir. 1993) (same), *and* United States v. Baldinger, 838 F.2d 176, 180 (6th Cir. 1988) (same), *with* Porcelli v. United States, 404 F.3d 157, 162 (2d Cir. 2005) (concluding that "the defendant does not need to literally 'obtain' money or property to violate the statute"); United States v. Hedaithy, 392 F.3d 580, 601-02 (3d Cir. 2004) (same); *and* United States v. Welch, 327 F.3d 1081, 1106-07 (10th Cir. 2003) (same). The Fifth Circuit appears not to have directly discussed this issue.

The starting point for interpreting statutes "must be the language of the statutes themselves."  United States v. Anderez, 661 F.2d 404, 406 (5th Cir. 1981).  Title 18, Section 1343, of the United States Code provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce . . . shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.  The offenses of wire fraud and its counterpart, the mail fraud statute, § 1341,[2] contain two basic elements: "(1) having devised or intending to devise a scheme to defraud (or to perform specified fraudulent acts), and (2) use of the mail [or wires] for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts)."  Carter v. United States, 120 S. Ct. 2159, 2165 (2000) (quoting Schmuck v. United States, 109 S. Ct. 1443, 1453 (1989)).  As the Fifth Circuit has held, the first element may be satisfied by proving either: (1) "the defendant devised a scheme or artifice to defraud . . . , or (2) the defendant devised a scheme or artifice to engage in one of the . . . fraudulent acts specified" in the statute.  United States

---

[2] "The Supreme Court has said that because the mail and wire fraud statutes share the same language in relevant part, the same analysis applies to each."  United States v. Mills, 199 F.3d 184, 188 (5th Cir. 1999) (citing Carpenter v. United States, 108 S. Ct. 316, 320 n.6 (1987)).

4

v. Caldwell, 302 F.3d 399, 406 (5th Cir. 2002).  Under both § 1341
and § 1343, the "fraudulent acts specified" include "[to] obtain[ ]
money or property by means of false or fraudulent pretenses,
representations, or promises . . . ." _See_ id.; 18 U.S.C. §§ 1341,
1343; _see also_ United States v. Chandler, 376 F.3d 1303, 1311 (11th
Cir. 2004) ("The phrasing of the statute in the disjunctive
prohibits two separate unlawful acts, each constituting an
independent ground for prosecution."); United States v. Cronic, 900
F.2d 1511, 1513 (10th Cir. 1990) ("Although largely overlapping, a
scheme to defraud, and a scheme to obtain money by means of false
or fraudulent pretenses, representations, or promises, are separate
offenses."); United States v. Clausen, 792 F.2d 102, 104-05 (8th
Cir. 1986) ("Courts have construed this statute to forbid _both_
schemes to defraud, whether or not any specific misrepresentations
are involved, _and_ schemes to obtain money or property by means of
false or fraudulent pretenses, representations, or promises.").

The statute's dichotomy is persuasively analyzed in United
States v. Hedaithy:

> We explained the interaction between the first and second
> clauses of § 1341 in United States v. Thomas, 315 F.3d
> 190 (3d Cir. 2002), in which we stated that "Congress
> intended the second dependent clause of the mail fraud
> statute to broaden the scope of the first clause.  The
> mail fraud statute was thus intended to cover 'any scheme
> or artifice to defraud [one of his money or property],'
> _including_ any '[scheme] for obtaining money or property
> by means of false or fraudulent . . . promises.'"  Id. at
> 198 (quoting McNally, 483 U.S. at 351, 107 S.Ct. 2875)
> (second alteration in original).  Under Defendants'

> interpretation of § 1341, however, the statute would cover "any scheme or artifice to defraud [one of his money or property]," *but limited to* any "[scheme] for obtaining money or property." Such an interpretation contravenes our holding in Thomas and we must therefore reject it.

392 F.3d at 602 (footnote omitted). Defendants in this case are arguing for the same limitation on schemes to defraud and, for the reasons explained in Hedaithy and similar cases, the argument must be rejected.

As also seen in Hedaithy above, Defendants' reliance on McNally v. United States, 107 S. Ct. 2875 (1987), for the proposition that the "obtain" language in the second clause wholly limits the scope of the "schemes to defraud" punishable under § 1343 is misplaced. *See* Document No. 964 at 7-11. McNally held that Congress, by adding the second clause, "or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," intended to clarify that a "scheme to defraud" also includes "'everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future.'" McNally, 107 S. Ct. at 2880-81 (quoting Durland v. United States, 16 S. Ct. 508, 511 (1896)). In doing so, Congress did not depart from the historical understanding of "fraud" as embedded in the first clause, which requires "wronging one in his *property rights* by dishonest methods or schemes." Id. at 2881 (emphasis added). Thus, the two clauses are

read conjunctively only insofar as McNally interpreted both to require the deprivation of money or property as the object of the fraud. However, as discussed above, it is well-recognized that the first and second clauses, in terms of the *manner* of executing the fraud, prescribe separate offenses. *See, e.g.*, Caldwell, 302 F.3d at 406. McNally itself observed that the words "to defraud," as used in the first clause, "usually signify the *deprivation* of something of value by trick, deceit, chicane or overreaching." McNally, 107 S. Ct. at 2881 (quoting Hammerschmidt v. United States, 44 S. Ct. 511, 512 (1924)) (emphasis added). One therefore may by dishonest means seek to defraud another of money or property without intending to obtain or to appropriate that interest for himself.

2.  Legal Sufficiency of the Alleged Shareholder Property

Defendants contend that the shareholders' intangible property right implicated in the Indictment--access to accurate corporate information--is not a cognizable property right sufficient to support the wire fraud charges. *See* Document No. 964 at 12-17; Document No. 952 at 15-18. Defendants argue that the only intangible rights recognized under § 1343 are those involving honest services. However, the mere intangibility of a property right "does not make it any less 'property' protected by the mail and wire fraud statutes." Carpenter v. United States, 108 S. Ct.

7

316, 320-21 (1987) (holding that a scheme to misappropriate confidential business information fell within the scope of § 1341); *see also* <u>Cleveland</u>, 121 S. Ct. at 371 (citing <u>Carpenter</u> with approval); <u>United States v. Little</u>, 889 F.2d 1367, 1368-69 (5th Cir. 1989) (recognizing valuable economic information as an intangible property right).

Although the Fifth Circuit has not adjudged whether a shareholder's right to accurate corporate information constitutes a cognizable intangible property interest in the context of §§ 1341 or 1343, the Second Circuit provides persuasive precedent in <u>United States v. Wallach</u>, 935 F.2d 445, 450-54, 460-64 (2d Cir. 1991), which had a factual scenario similar to the instant case.  In <u>Wallach</u>, the defendants, third-party consultants, were convicted of mail fraud, in concert with corporate officials, for hiding from shareholders the true nature of compensation packages the company offered to the consultants in order to avoid negative tax implications, skirt the Securities and Exchange Commission ("SEC"), and artificially inflate revenue and profit numbers.  <u>Id.</u> at 450-54, 460-61.

Drawing from decisions in which courts have recognized the deprivation or inaccurate reporting of material economic information as a deprivation of "property" under the mail and wire fraud statutes--including the Fifth Circuit's opinion in <u>Little</u>--the court explained that a shareholder's ownership interest in the

8

corporation carries with it certain ancillary property rights necessary to preserve and protect that interest:

> A stockholder's right to monitor and to police the behavior of the corporation and its officers is a property interest. This incident of stock ownership represents one way that a shareholder can protect the value of his or her investment. The maintenance of accurate books and records is of central importance to the preservation of this property interest. "The stockholders' right of inspection of the corporation's books and records rests upon the underlying ownership by them of the corporation's assets and property" and is an incident of "ownership of the corporate property." Indeed, given the important role that information plays in the valuation of a corporation, the right to complete and accurate information is one of the most essential sticks in the bundle of rights that comprise a stockholder's property interest.

Id. at 462-63.  The court concluded that the mail fraud statute encompassed the defendants' use of the mails to "misrepresent the nature of the transactions in which they were involved[,]" thereby "obscur[ing]" the value of the corporate stock and depriving the corporation and its shareholders "of the opportunity to make informed decisions."  Id. at 463-64.

The wire fraud alleged in this Indictment is premised on Enron's ostensible sale of the Nigerian barges to Merrill Lynch when, in fact, Defendants and Merrill Lynch allegedly agreed to the transaction only because the "purchase" was not real.  The Indictment charges that there was an "oral 'handshake' side-deal that Merrill Lynch would receive a rate of return of approximately 22% and that Enron would sell the barges to a third party or

9

repurchase the barges within six months"; hence, Merrill Lynch's supposed equity investment was not truly "at risk" and Enron's executives should not have treated the transaction as a sale from which earnings and cashflow could be recorded in 1999.  The fact that the transaction was reported to Enron's shareholders and the public as a *bona fide* sale for which earnings were reported necessarily deprived the shareholders of their right to complete and accurate information, and allegedly made Enron appear more profitable to the public than it was in fact.  Id. at 4-5.  Through the foregoing scheme, Defendants deprived Enron's shareholders of access to accurate corporate information and undermined their ability "to police the behavior of the corporation and its officers," thereby impairing their ability effectively to protect their ownership interest in Enron.  *See* Wallach, 935 F.2d at 463. Wallach, which itself relies on analogous Fifth Circuit precedent, supports the conclusion that accurate shareholder information is a legally cognizable intangible "property" right within the meaning of the wire fraud statute.[3]

---

[3] Defendants also suggest that recognizing a property right in accurate shareholder information would impermissibly overlap with federal securities laws.  *See* Document No. 964 at 15-17; Document No. 952 at 18.  However, "[t]he Federal Criminal Code is replete with provisions that criminalize overlapping conduct.  The mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either." Pasquantino v. United States, 125 S. Ct. 1766, 1773 n.4 (2005) (internal citations omitted).

3.   <u>Enron As a Victim</u>

a.   <u>Implications of the *Brown* decision</u>

Defendants also assert that the Fifth Circuit's opinion in <u>United States v. Brown</u>, 459 F.3d 509 (5th Cir. 2006), forecloses the treatment of Enron as a victim of the alleged scheme to defraud. *See* Document No. 964 at 3-7; Document No. 952 at 16-18. In <u>Brown</u>, the Fifth Circuit held that Defendants could not have conspired to or schemed to defraud Enron of honest services under § 1346. *See* <u>Brown</u>, 459 F.3d at 518-23. Its decision rested on the fact that the dishonest conduct of Enron officials was "disassociated from bribery or self-dealing and indeed associated with and concomitant to the employer's own immediate interest." <u>Id.</u> at 522. Because the Fifth Circuit held the honest services theory of wire fraud legally insufficient, it went no further in its analysis of the wire fraud charges. <u>Id.</u> at 522-23.

In fact, the Fifth Circuit "specifically" limited its analysis in <u>Brown</u> to the honest services theory of wire fraud, without reaching money or property wire fraud. <u>Id.</u> The court expressly stated that its "opinion should not be read to suggest that no dishonest, fraudulent, wrongful, or criminal act has occurred. We hold only that the alleged conduct is not a federal crime *under the honest-services theory of fraud specifically*." <u>Id.</u> at 523 (emphasis in original). <u>Brown</u> stated that "the Government must turn to other statutes, *or even the wire fraud statutes absent the*

11

*component of honest services*, to punish this character of wrongdoing." Id. 522-23 (emphasis added).[4]

The Third Superseding Indictment, with the honest services theory now stricken, charges Defendants only with wire fraud and conspiracy to commit wire fraud under a money or property theory and falsification of books and records theory. *See* Document No. 937 at 9, 12. Although Brown exclusively analyzed the Government's honest services theory of wire fraud, and expressly declined to "address the viability of the Government's remaining theories of

---

[4] Defendants also highlight Brown's characterization of Enron as a "willing beneficiary" to suggest that Enron cannot be a victim. *See* Document No. 964 at 4 (citing Brown, 459 F.3d at 522-23 n.13). However, like the entire Brown discussion regarding wire fraud, this term and its application apply only to the honest services theory of wire fraud and not to a money or property theory. *See* Brown, 459 F.3d 523. Moreover, a corporation and its shareholders enjoy identities separate and distinct from corporate officers or directors. *See* Wallach, 935 F.2d at 462, 464 (recognizing the separate roles played by shareholders, directors, officers, and the corporation itself). Hence, the alleged involvement of Enron insiders in the alleged scheme does not preclude Enron from being a victim. Id. at 464. As the court in Wallach held:

> We cannot accept defendants' argument that the directors and officers of the corporation have the authority to act on behalf of the shareholders and the corporation and that therefore a criminal fraud cannot be perpetrated when all the officers are participants in the scheme. Defendants would have us endorse a theory of criminal law that would effectively grant corporate officials and third-parties working in concert with them a license to loot the corporate treasury as long as they were all in on the scheme. . . . Such a theory completely fails to recognize and to protect the property interests of the shareholders and the corporation.

Id.

criminal liability (the money-or-property and books-and-records charges)," Brown, 459 F.3d at 523, the Circuit's simultaneous statement that the "Government must turn to other statutes, or even the wire fraud statutes absent the component of honest services," id., on balance leads to the conclusion that Brown does not exclude Enron as a victim of the money or property theory of wire fraud alleged in the Indictment.

b.   Dismissal on the Basis of Double Jeopardy

Relying on their interpretation of Brown, however, Defendants assert that to re-try them on a theory that Enron was a victim would violate the Double Jeopardy Clause.  See Document No. 964 at 3-6; Document No. 1022 at 1-2.  According to Defendants, the money and property theory of fraud remaining in the Indictment depends on proof that Enron employees with whom Defendants allegedly conspired necessarily deprived Enron of the honest services of those Enron employees--the very theory invalidated in Brown.  Asserting that there is a "logically inextricable connection" between the honest services and money and property theories of wire fraud with respect to the Enron employees, the Merrill Lynch Defendants argue that the Double Jeopardy Clause will be violated if they are retried for conduct committed jointly with those Enron employees--allegedly to victimize Enron by defrauding it of money and property--when the

Fifth Circuit has held that Enron was not deprived of the honest services of those same employees on the same set of facts.

The Double Jeopardy Clause of the Fifth Amendment incorporates the doctrine of collateral estoppel. *See* Ashe v. Swenson, 90 S. Ct. 1189, 1195 (1970). "Collateral estoppel guarantees that 'when an issue of ultimate fact has once been determined by a valid and final judgment, the issue cannot again be litigated between the same parties in any future lawsuit.'" United States v. Brackett, 113 F.3d 1396, 1398 (5th Cir. 1997) (quoting Ashe, 90 S. Ct. at 1194)). The doctrine of collateral estoppel completely bars a subsequent prosecution "when an issue of ultimate fact has once been determined by a valid and final judgment." Ashe, 90 S. Ct. at 1194.

The Court's opinion in Brown emphasizes in italics that its holding is "only that the alleged conduct is not a federal crime *under the honest-services theory of fraud specifically*." Brown, 459 F.3d at 523 (emphasis in original). The Court traced the history of § 1346, which criminalizes the deprivation of another's "intangible right of honest services." The Court declared its agreement with the Second Circuit in United States v. Rybicki, 354 F.3d 124 (2d Cir. 2003), and construed the statute to proscribe either bribery and kickbacks or self-dealing, which were not present here. Given the Fifth Circuit's narrow construction of the statute, it does not necessarily follow that Enron's employees

14

still could not have conspired and schemed with the Merrill Lynch Defendants to defraud Enron of money and property that did not entail bribery, kickbacks, or self-dealing by Enron's employees.

Brown concluded that the legal insufficiency of the honest services theory underlying the general verdict on charges of wire fraud and conspiracy required reversal of Defendants' convictions pursuant to Yates v. United States, 77 S. Ct. 1064, 1073 (1957) (holding that the legal invalidity of one of multiple theories of criminal liability underlying a general verdict of conspiracy requires reversal of the conviction). *See* Brown, 459 F.3d at 517, 523. It is well settled that "[t]he successful appeal of a judgment of conviction, on any ground other than the insufficiency of the evidence to support the verdict, poses no bar to further prosecution on the same charge." United States v. Scott, 98 S. Ct. 2187, 2193-94 (1978). Given Brown's construction of § 1346 and the emphatic limitation of its holding to the honest services theory as so construed, its express citation to Yates as mandating reversal, and the Court's determination that the honest services theory was legally, not factually, insufficient, Defendants' double jeopardy argument lacks merit. Defendants may properly be retried on the independent money and property theory of wire fraud, both as a

stand-alone offense, and as a predicate offense to the conspiracy charge.[5]

     c.    <u>Interlocutory Appeal of Double Jeopardy Claim</u>

Alternatively, Defendants request that this Court certify their Double Jeopardy claim as non-frivolous to enable an interlocutory appeal on this issue. "[T]he denial of a double jeopardy motion is an appealable order under 28 U.S.C. § 1291." <u>United States v. Dunbar</u>, 611 F.2d 985, 987 (5th Cir. 1980) (en banc) (citing <u>Abney v. United States</u>, 97 S. Ct. 2034 (1977)). Whether a trial should be delayed pending interlocutory resolution of a double jeopardy claim depends on the court's express findings that such claim is not frivolous. *See* <u>id.</u> at 987-88. "If the claim is frivolous, the filing of a notice of appeal by the defendant shall not divest the district court of jurisdiction over the case. If nonfrivolous, of course, the trial cannot proceed

---

[5]    Defendants also contend that, pursuant to <u>Brown</u>, the law-of-the-case doctrine precludes relitigation of Enron's status as a victim of the alleged fraud. *See* Document No. 964 at 6-7. As discussed above, because <u>Brown</u> reversed "*under the honest-services theory of fraud specifically*," the court declined to "address the viability of the Government's remaining theories of criminal liability," including the money or property theory of wire fraud. <u>Brown</u>, 459 F.3d at 523. Defendants' subsequent prosecution under a theory that <u>Brown</u> did not consider or adjudicate will not require the trial court to revisit issues of fact or law definitively resolved on appeal so as to implicate the law-of-the-case doctrine. *See, e.g.*, <u>United States v. Beccara</u>, 155 F.3d 740, 752 (5th Cir. 1998) (stating that the law-of-the-case doctrine precludes the district court from revisiting issues of law or fact decided on appeal).

until a determination is made of the merits of an appeal." <u>Id.</u> at 988; *see also* <u>United States v. Angleton</u>, 221 F. Supp. 2d 696, 703 (S.D. Tex. 2002) (Rosenthal, J.) (stating that courts should not stay proceedings if a double jeopardy claim is frivolous or sought merely for purposes of delay).

The Fifth Circuit has instructed that courts should apply the literal meaning of the term "frivolous" when determining whether to stay the case pending interlocutory appeal, bearing in mind that the frivolousness inquiry is intended to prevent dilatory claims, not colorable ones. *See* <u>United States v. Kalish</u>, 690 F.2d 1144, 1154 (5th Cir. 1982); *see also* <u>Angleton</u>, 221 F. Supp. 2d at 736-37. For instance, "whether arguments are frivolous for the purpose of imposing sanctions, courts examine whether 'they are warranted by existing law or any plausible good faith argument for the extension, modification or reversal of existing law.'" <u>Angleton</u>, 221 F. Supp. 2d at 739 (quoting <u>Reed v. Commercial State Bank of El Campo</u>, 861 F.2d 1381, 1383 (5th Cir. 1988)); *see also* FED. R. CIV. P. 11(b)(2).  The Supreme Court has noted that a double jeopardy plea is considered non-frivolous if it is "colorable," that is, a claim to which "there is some possible validity." <u>Richardson v. United States</u>, 104 S. Ct. 3081, 2034 n.6 (1984).

This Court's reading of <u>Brown</u>, set forth above, depends in large measure upon the Fifth Circuit's emphatic limitation of its review to, and narrow construction of, § 1346, and its expressed

declination to "address the viability of the Government's remaining theories of criminal liability (the money-or-property and books-and-records charges)." <u>Brown</u>, 459 F.3d at 523. Those same factors, however, also support an inference that the Fifth Circuit may not have considered the syllogistic argument now advanced by Defendants, namely, that (1) <u>Brown</u> holds that Defendants and Enron employees on the scheme to defraud alleged in this case did not deprive Enron of its intangible right to honest services of its implicated employees; (2) Defendants are now charged with conspiring and acting jointly with the same Enron employees on the same scheme to defraud Enron of its money and property; and (3) to try Defendants on the latter charge necessarily requires proof that Enron was deprived of the intangible right to the honest services of its implicated employees, which subjects Defendants to double jeopardy.

This Court has concluded that while proof of Defendants and Enron employees jointly conspiring and acting to defraud Enron of money and property would implicate one's common understanding of honest services owed to Enron by its employees, <u>Brown</u> expressly limits its holding to this scheme not constituting a crime under § 1346. This is because the appellate court essentially interprets § 1346 as proscribing only bribery, kickbacks, and self-dealing. Whether this is a bright-line limitation on the reach of § 1346, however, appears somewhat doubtful. For example, <u>Brown</u> limited "to

18

its facts" and did not attempt "to call into question the result" adjudged in <u>United States v. Gray</u>, 96 F.3d 769 (5th Cir. 1996), which affirmed convictions of mail and wire fraud to deprive an employer of its employees' honest services under § 1346 where the crime involved no bribery, kickbacks, or self-dealing. <u>Brown</u>, 459 F.3d at 522-23, n.13.  Moreover, <u>Brown</u> does not discuss the inter-relationship of the underlying theories of wire fraud all based on the same alleged scheme and set of facts.  Even the Circuit Court's conclusion that the "Government must turn to other statutes, or *even the wire fraud statutes absent the component of honest services*, to punish this character of wrongdoing," <u>id.</u> at 523 (emphasis added), seems to be written more in the abstract rather than as a specific approval for retrying *these* Defendants on *this* Third Superseding Indictment as now redacted.  Moreover, neither side has cited any authority, and the Court has found none, analyzing the Government's ability to prosecute wire fraud on a money and property theory when the victim is an employer of persons charged in the scheme and where the underlying conduct of the employees has been held not to constitute a scheme to defraud the victim of the employees' honest services, let alone a case examining the interplay between these theories in the context of a factually similar indictment.  The Court therefore must conclude that Defendants' double jeopardy argument at least meets the threshold of not being frivolous, as that term is explained in

<u>Dunbar</u> and <u>Kalish</u>, and Defendants have not advanced their argument solely for the purpose of delay.  Accordingly, if Defendants timely perfect an interlocutory appeal of this Order under <u>Abney</u> and <u>Dunbar</u>, this Court will not be able to proceed in this case until the Court of Appeals determines the merits of Defendants' double jeopardy claim.

B.    <u>Conspiracy to Falsify Books and Records</u>

        Defendants also challenge the conspiracy to falsify books and records charge.  *See* Document No. 964 at 18-24; Document No. 952 at 18-36.  Defendants contend that because § 78m(b) governs the conduct of "issuers," there can be no criminal liability when a third party conspires with an issuer to falsify books or records.  *See* Document No. 964 at 18-24; Document No. 952 at 18-29.  Section 78m(b) states:

> (2) Every issuer which has a class of securities registered pursuant to section 78*l* of this title and every issuer which is required to file reports pursuant to section 78*o*(d) of this title shall--
>
>> (A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>>
>> (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that--
>>
>>> (i) transactions are executed in accordance with management's general or specific authorization;

20

. . . .

(4) No criminal liability shall be imposed for failing to comply with the requirements of paragraph (2) of this subsection except as provided in paragraph (5) of this subsection.

(5) No person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph (2).

15 U.S.C. § 78m(b)(2), (4)-(5).   Assuming, *arguendo*, § 78m(b) creates liability only for "issuers," Defendants' argument is still flawed.

Title 18, Section 371, of the United States Code criminalizes conspiracy to "commit any offense against the United States." 18 U.S.C. § 371.  The general conspiracy rule proclaims § 371 to be "'a broad and comprehensive provision denouncing conspiracies to commit offenses created by *any* of the statutes of the United States.'"  U.S. v. Gibson, 881 F.2d 318, 321 (6th Cir. 1989) (quoting Thomas v. United States, 156 F. 897, 901 (8th Cir. 1907)). Accordingly, "the incapacity of a person to commit the substantive offense does not necessarily imply that he may conspire with others to commit the offense with impunity, since the state may criminalize the collective planning of the criminal conduct." United States v. Castle, 925 F.2d 831, 833 (5th Cir. 1991) (citing Gebardi v. United States, 53 S. Ct. 35, 37 (1932)); *see also* Salinas v. United States, 118 S. Ct. 469, 477 (1997).  "For

21

example, it is a crime for a bankrupt to conceal property from his trustee, and thus only bankrupts may be convicted of the substantive offense of concealing property.  But convictions of others for conspiring with the bankrupt to conceal property have been upheld." Castle, 925 F.2d at 833.

A limited exception to the general conspiracy rule exists when "Congress intend[s] in [statutes] to deter and punish certain activities which necessarily involve[] the agreement of at least two people, but Congress [chooses] in [the] statutes to punish only one party to the agreement." Id. at 833, 836 (applying this exception to find that foreign officials who accepted bribes were exempt from prosecution for conspiracy to violate the Foreign Corrupt Practices Act ("FCPA") because that statute only criminalized the conduct of the payors) (footnote omitted); see also Gebardi, 53 S. Ct. at 36-37 (holding that women who agreed to be transported across state lines for illicit purposes could not be prosecuted for conspiracy to violate the Mann Act because the Act only criminalized the conduct of the transporters).

In this case, § 78m(b) criminalizes the knowing falsification of corporate books and records by issuers of securities. See 15 U.S.C. § 78m(b).  Unlike the Mann Act and the bribery provision in the FCPA, which each require participation by at least two parties but where Congress has criminalized the conduct of only one and not the other, the conduct proscribed by § 78m(b) does not require

participation by a second party whose conduct is not criminalized by the statute. *See* id.; *see also* United States v. Lake, 472 F.3d 1247, 1263-67 (10th Cir. 2007) (concluding that the exception articulated in Gerbardi and Castle would not invalidate a charge of conspiracy to circumvent the internal accounting controls required in § 78m(b) because participation of another person is not necessary to violate the substantive offense).   Therefore, the exception to the general conspiracy rule is inapplicable.   Just as non-bankrupt persons can conspire with a bankrupt petitioner to hide the bankrupt's assets, so too can non-issuers conspire with issuers to falsify the issuer's books and records--as it is alleged that Defendants did here.[6]

---

[6] Defendants also argue that because Enron was "a massive user of capital, closing more than fifty financing deals annually totaling $20 *billion* or more," the relatively small Nigerian Barge transaction was immaterial as a matter of law, and therefore the books and records charge must be dismissed. *See* Document No. 952 at 30-36 (internal quotation marks omitted).   Materiality is governed by a "reasonable investor" standard.   Isquith v. Middle S. Utils., Inc., 847 F.2d 186, 208 & n.16 (5th Cir. 1988) (citing Durning v. First Boston Corp., 815 F.2d 1265, 1268 (9th Cir. 1987)) (applying principles of materiality in discussing the standards governing the very similar issue of adequacy of disclosure).   "The test for determining whether or not a fact is material is whether 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'"   Durning, 815 F.2d at 1268 n.4 (quoting TSC Indus. Inc. v. Northway, Inc., 96 S. Ct. 2126, 2132 (1975)).   Thus, the size of the Nigerian Barge transaction in proportion to Enron's annual dealings is incon-sequential to the analysis of materiality.   Moreover, assuming, without deciding, that materiality is required to violate § 78m(b), generally, "materiality is a question for the jury, not the court." United States v. McGuire, 99 F.3d 671, 672 (5th Cir. 1996) (citing United States v. Gaudin, 115 S. Ct. 2310 (1995)); *see also* S.E.C. v. World-Wide Coin Invs., Ltd., 567 F. Supp. 724, 748-50 (D.C. Ga.

For the foregoing reasons, Defendants Daniel Bayly's, James Brown's, and Robert Furst's Motions to Dismiss (Document Nos. 952 and 964) are hereby DENIED.  However, Defendants' contention that the Double Jeopardy Clause will be violated if they are retried for wire fraud on the money and property theory is found to be a colorable, non-frivolous contention.

It is SO ORDERED.

The Clerk will enter this Order, providing a correct copy to all counsel of record.

SIGNED in Houston, Texas, on this 7th day of January, 2008.

_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

---

1983) (holding that the SEC is not required to prove materiality to establish a violation of section 13(b)(2) of the Securities and Exchange Act of 1994, codified at § 78m(b)(2)).